**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

FILED

APR 1 5 2020

Clerk, U. S. District Court
Eastern District of Tennessee
~~ville~~

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF THE ELECTRONIC DEVICES MORE FULLY DESCRIBED IN ATTACHMENT A.** | Case No. 3:20-MJ-2103 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH

I, Ted Francisco, Special Agent with the Homeland Security Investigations ("HSI"), being duly sworn, depose and state that:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3.      I have been a Special Agent with Homeland Security and its predecessor since the 2000. Previously I worked for 13 years in local law enforcement. I am currently assigned to the HSI Office of the Resident Agent in Charge in Knoxville, Tennessee (HSI Knoxville). I have a vast amount of experience in federal narcotics investigations.

4. I have participated in numerous narcotics investigations. These investigations have resulted in the arrests of numerous targets and the seizure of various narcotics and assets. During the course of these investigations, I have debriefed defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations, conducted physical surveillance, supported wiretaps, executed search warrants, served subpoenas, analyzed and evaluated evidence and information obtained from court authorized pen registers and trap and trace intercepts, telephone tolls, financial documents, reviewed and transcribed recorded calls, and provided testimony. As a result of my experience and training, I am familiar with the manner in which various types of illegal drugs are cultivated, manufactured, transported, smuggled, distributed, or diverted, as well as methods used to finance drug transactions and launder drug proceeds.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**<u>IDENTIFICATION OF THE DEVICES TO BE EXAMINED</u>**

6. The property to be searched is:

    a. Phones recovered from Jose Cruz Landeroz-Tovar ("LANDEROZ"):

        i. Samsung Galaxy J2, Model: SM-J260T1, Phone #: 706-837-8451, IMEI: 356212108070237

        ii. Samsung Galaxy Aloe, Model: SM-A102U; IMEI: 353489110228168A

        iii. iPhone S Model A 1688

    Collectively known as the ("LANDEROZ DEVICES")

    b. Phones recovered from Mariano Gonzales ("GONZALES") and Adolfo Dominguez ("DOMINGUEZ"):

2

    i.   Samsung Model A102U, IMEI: 359620104009610

    ii.   Samsung Model A102U, IMEI: 359620104199429

    iii.   Samsung Model A102U, IMEI: 356274109035767

    iv.   Samsung G6

    Collectively known as the ("DRIVERS' DEVICES"),

The phones above, the LANDEROZ DEVICES and the DRIVERS' DEVICES, are hereinafter collectively known as the "TARGET DEVICES." The TARGET DEVICES are currently located in a secure law enforcement facility located at 324 Prosperity Drive, Knoxville, TN 37923.

7.    The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8.    On or about December 12, 2019, a vehicle wrecked in the Eastern District of Tennessee. A witness saw the driver and the passenger flee the wrecked vehicle, and saw the passenger carrying a pelican case. Law enforcement arrived on the scene, and nearby found a pelican case with approximately 500 grams of crystal substance inside. Based on my training and experience, I believe that the substance recovered was methamphetamine[1].

9.    Both the driver and passenger were located nearby and spoke with law enforcement and admitted that they were transporting methamphetamine. Both admitted that they had recently traveled to the Northern District of Georgia and bought the methamphetamine

---

[1] When referenced in this affidavit, seized drugs have not yet been tested, but appeared, based on my training and experience, as well as the training and experience of other officers, to be the particular drug seized and identified in the affidavit. Based on an increased threat to law enforcement officers on the scene of drug seizures from accidental overdoses or exposure to the seized drugs, I know that many law enforcement officer and agencies are not field-testing narcotics on the scene, but rather sending drugs to a lab for testing.

through a Hispanic woman named "Maria." Law enforcement obtained consent to search the phone of the driver and thus began a law enforcement investigation. Law enforcement later learned through text message search warrants, wiretaps, and other investigation that Maria Alejandra Magana Madrigal ("MARIA") was the same "Maria" referenced by the driver and the passenger of the wrecked vehicle. In sum, I know that MARIA was the source of supply of the methamphetamine seized in the Eastern District of Tennessee.

10. Law enforcement, through the use of text message search warrants, wiretaps on phones used by MARIA, geolocation information on phones used by MARIA, and other investigation, learned that MARIA was a drug trafficker that was coordinating operations for a drug trafficking organization ("DTO") in the Northern District of Georgia.

11. For example, law enforcement surveillance revealed that MARIA was staying in a hotel room in the Northern District of Georgia on or about December 23, 2019. Law enforcement observed a male drive up and park near MARIA's hotel room door, get out of his vehicle, and go inside. The male then emerged from that room with a black duffel back and then left the area in his vehicle. Another male, later learned to be Cody Seals ("SEALS"), then arrived in the hotel parking lot. SEALS was driving a vehicle with Tennessee plates. SEALS went inside the hotel room where MARIA was staying and then emerged carrying a "Doritos" bag. SEALS got back into his vehicle and headed north, back into Tennessee. In the Eastern District of Tennessee, Tennessee Highway Patrol ("THP") troopers noticed that SEALS was following another vehicle much too closely in violation of the law and attempted to pull over SEALS' vehicle. But SEALS began firing a handgun at the THP troopers as they pursued his fleeing vehicle. SEALS' vehicle was contacted by a pursuing trooper's vehicle and then stopped. SEALS emerged from his vehicle with an assault rifle and fired a very large number of shots at the troopers. One trooper

4

was struck in the leg by a bullet. SEALS was struck by a bullet fired by a trooper and was taken into custody. In SEALS' vehicle law enforcement discovered approximately 1.5 kilograms of methamphetamine in a Doritos bag, and approximately 500 grams of heroin.

12.     After SEALS left the hotel parking lot where MARIA was staying, law enforcement officers observed MARIA and Luis Pena, ("PENA") depart the hotel room that SEALS had earlier entered. After committing a traffic violation, MARIA and PENA were traffic stopped by law enforcement. MARIA gave a false identification to officers and PENA gave what appeared to be a real Mexican identification card to law enforcement. Both were permitted to go on their way.

13.     After this date, lawful wire intercepts, geo-location data, searched of seized phones, text message search warrants and other investigation revealed that MARIA continued to distribute kilogram quantities of methamphetamine. For example, from the middle of February, 2020, until the present, law enforcement intercepted numerous conversations over wiretaps in which MARIA coordinated the distribution of kilogram quantities of methamphetamine and other drugs.

14.     Geo-location data from phones used by MARIA showed that MARIA visited 917 Pleasant Hill Road in Conyers, Georgia ("STASH HOUSE") somewhat frequently. Law enforcement surveillance on the STASH HOUSE observed that it was a one story residential home in a rural area that was approximately 30-40 minutes from where MARIA lived. It did not appear from surveillance that anyone lived there.

15.     At approximately 7:00pm on March 9, 2020, and into the early morning hours of March 10, 2020, law enforcement executed a search warrant on the STASH HOUSE. Inside two vehicles at the STASH HOUSE property, a bus and a tractor-trailer, law enforcement discovered

5

more than 800 kilograms of methamphetamine hidden in compartments. Inside the house, law enforcement found equipment with possible methamphetamine residue that can be used to convert liquid methamphetamine into crystal methamphetamine. There were no beds in the STASH HOUSE. In the approximately 24 hours leading up to the seizure, law enforcement surveillance spotted multiple individuals at the STASH HOUSE working on or near the bus and tractor trailer and appearing to load or unload something. Based on prior law enforcement surveillance, the activity was highly unusual for the STASH HOUSE location. In total, law enforcement seized approximately 916 kilograms of methamphetamine on or about March 9, 2020, including over 800 kilograms at the STASH HOUSE and approximately 52 kilograms at another location used by the DTO.

16. Present at the STASH HOUSE shortly before the methamphetamine was seized were GONZALES and DOMINGUEZ. Shortly before law enforcement executed a warrant on the STASH HOUSE, law enforcement surveilled GONZALES and DOMINGUEZ leave the stash house together in a vehicle. Law enforcement allowed the vehicle to travel out of view of the STASH HOUSE and then pulled over the vehicle with GONZALES and DOMINGUEZ inside. Inside the vehicle, law enforcement discovered the DRIVERS' DEVICES. GONZALES possessed $17,000 in his pocket.

17. Records showed that both GONZALES and DOMINGUEZ had crossed the border from Mexico approximately 2-3 days before March 9, 2020. Records showed that GONZALES drove a bus across the border and that DOMINGUEZ walked across the border. Law enforcement found the bus that GONZALES drove across the border at the STASH HOUSE, and the bus contained approximately 17 kilograms of methamphetamine hidden inside.

18. One individual at the STASH HOUSE told law enforcement that everyone at the

6

STASH HOUSE had worked together to unload methamphetamine off the bus.

19.     That same day, on or about March 9, 2020, and before the STASH HOUSE was searched, LANDEROZ was carrying a phone used by another co-conspirator, which law enforcement tracked pursuant to a geo-location warrant.   The geo-location data showed the phone leaving the STASH HOUSE and approaching another house law enforcement intended to search that night.   LANDEROZ was spotted arriving at the house in a vehicle, driving into the garage, and then departing a few minutes later.   LANDEROZ's vehicle was stopped nearby and law enforcement found a firearm, a small amount (gram quantities) of methamphetamine, drug paraphernalia, and approximately $2,500 in cash inside LANDEROZ's vehicle.   On LANDEROZ's person, and in the vehicle driven by LANDEROZ, law enforcement found the LANDEROZ DEVICES. LANDEROZ admitted to law enforcement that he worked for MARIA. Inside the house that LANDEROZ had just visited, law enforcement found approximately 52 kilograms of methamphetamine, along with approximately $180,000.

20.     Based on my training and experience I know that drug traffickers use cellphones to run their drug business. They frequently use cellphones to contact sources of supply, customers, banks, rental car companies, and others through text messages and phone calls.   They use applications to communicate using end-to-end encryption.   They use applications to send cash drug proceeds and receive cash payment from drug customers.   They use GPS applications to locate and go to stash houses, customers, sources of supply, and banks.   They take pictures of their product (drugs) and their proceeds (cash) both to further their business but also sometimes to boast about their business.

21.     I am aware that this particular DTO used cellphone extensively to coordinate the trafficking of methamphetamine through calls, texts, and the use of messaging applications.

7

22.     I also know that a search of a cellphone frequently can tell us a lot about where a person has been. Many phones retain the location of the cellphone at various points in the past.

23.     Finally I know that virtually all of the information on a cellphone is valuable evidence of who owns the phone, who was using the phone in the past, and when the phone was being used. All of this evidence is critical to understanding the ownership of a particular device as well as understanding who was using a phone when and if it was used for criminal purposes.

## TECHNICAL TERMS

24.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also

include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected

9

to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

10

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25. Based on my training, experience, and research, I believe that the TARGET DEVICES have capabilities that allow them to serve as a wireless telephone, digital camera, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

11

28.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

29.  *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

30.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

SA TED FRANCISCO
HSI

Subscribed and sworn to before me
on April 13, 2020:

H. BRUCE GUYTON
UNITED STATES MAGISTRATE JUDGE

12

## ATTACHMENT A

31.    The property to be searched is:

    a.   Phones recovered from Jose Cruz Landeroz-Tovar ("LANDEROZ"):

        i.   Samsung Galaxy J2, Model: SM-J260T1, Phone #: 706-837-8451, IMEI: 356212108070237

        ii.   Samsung Galaxy Aloe, Model: SM-A102U; IMEI: 353489110228168A

        iii.   iPhone S Model A 1688

    Collectively known as the ("LANDEROZ DEVICES")

    b.   Phones recovered from Mariano Gonzales ("GONZALES") and Adolfo Dominguez ("DOMINGUEZ"):

        i.   Samsung Model A102U, IMEI: 359620104009610

        ii.   Samsung Model A102U, IMEI: 359620104199429

        iii.   Samsung Model A102U, IMEI: 356274109035767

        iv.   Samsung G6

    Collectively known as the ("DRIVERS' DEVICES"),

The phones above, the LANDEROZ DEVICES and the DRIVERS' DEVICES, are hereinafter collectively known as the "TARGET DEVICES." The TARGET DEVICES are currently located in a secure law enforcement facility 324 Prosperity Drive, Knoxville, TN 37923.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.    All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841 and 846, including:

    a.  lists of customers and suppliers, along with related identifying information;

    b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d.  any information about schedules or travel;

    e.  all bank records, checks, credit card bills, account information, and other financial records.

    f.  Communications and related contacts that relate to the trafficking of narcotics, the movement of cash proceeds, or the payment for illegal drugs.

    g.  Evidence related to the possession or distribution of illegal drugs, including but not limited to photographs, communications, location data.

2.    Evidence of user attribution showing who used or owned the Device including, among other things, photographs, geo-location information, communications, logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.    Evidence of motive, opportunity, or intent, such as bills, communications, photographs, geo-location information, logs, documents, browsing history, and other items.